|   |   |
|---|---|
|   | The Honorable Karen A. Overstreet |
|   | Hearing Date: December 18, 2009 |
|   | Hearing Time: 9:30 am. |
|   | Response Date: December 11, 2009 |
|   | Chapter 11 |

Diana K. Carey, WSBA #16239
Michael M. Feinberg, WSBA #11811
Karr Tuttle Campbell
1201 Third Ave., Suite 2900
Seattle, WA 98101
Telephone: (206) 224-8888
Fax: (206) 682-7100

Attorneys for Regal Financial Bank

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

In Re: )
) NO. 09-21610-KAO
WELLINGTON PARK POINTE LLC, )
) DECLARATION OF RICHARD J.
Debtor. ) BRISCOE
)

Richard J. Briscoe states under penalty of perjury under the laws of the United States as follows:

1. I am a Vice President with GVA Kidder Matthews in Seattle, WA. I have been a designated member of the Appraisal Institute since 1992. I am a Certified General Real Estate Appraiser in the States of Washington and Oregon. Attached as <u>Exhibit 1</u> is a copy of my curriculum vitae. All statements in this declaration are based on my personal knowledge.

DECLARATION OF RICHARD J. BRISCOE - 1
#730414 v1 / 32389-004

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

2. I was retained by Regal Bank to, among other things, perform a desk review of the (1) Strickland, Heischman & Hoss Appraisal, dated July 15, 2009, with date of value of July 3, 2009 ("Heischman Appraisal"), and (2) the Private Valuations Appraisal, dated October 30, 2009, with date of value of November 1, 2009. Attached as Exhibits 2 & 3 are copies of my desk reviews of those appraisals.

3. As noted in my desk review, the Heischman Appraisal contains an error in its discounting computation. The basic methodology of the Heischman Appraisal was to determine a hypothetical future value for Phase I and Phase II of the project based on comparable sales, the estimated the costs of completing the required infrastructure improvements, and an estimated absorption rate. The appraisal then determined a value of each of the two phases using a discounted cash flow back to the completion date for each phase: July 2011 in the case of Phase I, and July 2012 for Phase II. It then discounts each cash flow back to December 2009 (the date it assumes that preliminary plat approval will be obtained) to arrive at a prospective value with preliminary plat approval as of December 2009. Estimated costs to obtain plat approval are then subtracted from the December 2009 value, and this subtotal is discounted back to the date of the appraisal to arrive at the a value of the of the plat, assuming it had preliminary plat approval on the date of the appraisal.

4. The mathematical errors in the Heischman Appraisal are in the discounting formulas on page 87 and page 88. It uses an "n" value of 24 for the number of months between July 2012 and December 2009, and an "n" value of 12 for the number of months between July 2011 and December 2009, when the actual number of months are 30 and 18, respectively. If the proper "n" value of 18 is used in the formula on page 87 of the Heischman
DECLARATION OF RICHARD J. BRISCOE - 2
#730414 v1 / 32389-004

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Appraisal, this results in a value for Phase I of $8,850,027 as of December 2009. If the proper value "n" value of 30 is used in the formula on page 88, this results in a value for Phase II of prospective value as of December 2009 of $5,815,440, and a combined value as of December 2009 of $14,665,468. Substituting this value in the formula at the bottom of page 88 results in a value as of the July 2009 date of inspection of $13,375,607.

5. Subsequent to the Heischman Appraisal, a final EIS was approved. No adjustment in value is required for this fact because it is an "extraordinary assumption" in the Heischman Appraisal that final plat approval of the property will be obtained, thus it already accounts for the value added by the EIS.

6. The Heischman Appraisal's $40,000 assumption of the costs necessary to obtain preliminary plat approval is grossly low. I have been advised that the Debtor filed a budget showing that it estimates that engineering and architectural costs for the first six months of the plat approval process will be $222,448. If the actual numbers to obtain plat approval are substituted in the formula used in the Heischman Appraisal, this would further reduce the appraised value. Based on my experience, I would expect that the ultimate cost of the engineering and architectural fees to obtain plat approval may significantly increase this number by as much as a factor of three, further reducing the appraised as is value.

Dated: December 15, 2009, in Seattle, Washington.

_____
Richard J. Briscoe

DECLARATION OF RICHARD J. BRISCOE - 3
#730414 v1 / 32389-004

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

## Richard J. Briscoe, MAI
VICE PRESIDENT

### Career Highlights

Mr. Briscoe became a designated member of the Appraisal Institute in 1992 (Member Number 9795) after completing the initial education and experience requirements in the preceding six years of appraisal training. His continuing education requirements have been met to maintain a current status with the Appraisal Institute. He has served on the Appraisal Institute's Region I Ethics and Counseling Regional Panel.

Founded Terra Property Analytics in 1997. Prior to that, opened a Seattle Branch for Koeppel Tener Real Estate Services in May 1995. Originally entered private appraisal practice with Lipman, Stevens and Marshall in August of 1986. In November of 1992, Mr. Briscoe joined the offices of Lyon, Skelte and Speirs, working in both the Portland, Oregon and Seattle, Washington offices, through May of 1995.

Appraisal assignments have been completed regarding a wide variety of property types including apartments, condominiums, offices, medical offices, industrial, high-tech, hotels and resorts, retail, golf courses, regional malls, and vacant land. Experience also includes partial interests, special use properties, feasibility studies, and portfolio assignments. Areas of experience include work in Washington, Oregon, California, Alaska, Utah, North Carolina, Texas and Tennessee. The following is a partial list of clients for whom assignments have been completed.

### Certifications

- State of Washington Certified General Real Estate Appraiser (No. 1100402)
- State of Oregon Certified General Real Estate Appraiser (No. C000511)



**VALUATION ADVISORY**
**Partial Client List**

**Corporate**
American Stores
Kilroy Industries
Meridian Realty
Olympic Foods
Ritchie Brothers Auctioneers
Safeway
Seattle Times
Sekotac
ST Corporation
St. Vincent de Paul
US Small Business Association
Wal Mart

**Legal**
Beresford Booth
Demaray & Trompeter
Bob Prince, Esq.
Graham & James
Perkins Coie

**Realty Advisors**
AMRESCO
ARES/Whitehall
ICON Associates
JP Morgan
Kennedy & Associates
Merrill Lynch
Morgan Stanley
PaineWebber
Real Estate Securities

GVA Kidder Mathews      EX. 1      www.gvakm.com

# Richard J. Briscoe (cont.)

## Representative Assignments (partial list)

### Office Properties

| | |
|---|---|
| Eastgate Office Park, Bellevue, WA | 295,000sf |
| Marketplace I & II, Seattle, WA | 220,000sf |
| SeaTac Office Towers, SeaTac, WA | 532,000sf |
| One Twelfth @ Twelfth, Bellevue, WA | 480,000sf |
| Sunset Corporate Campus, Bellevue, WA | 306,000sf |
| First & Stewart Building, Seattle, WA | 116,000sf |

### Industrial Properties

| | |
|---|---|
| Intracorp Building A, Everett, WA | 110,000sf |
| Trans Pacific Industrial Park, Fife, WA | 1,550,000sf |
| Matsushita Fab Plant, Puyallup, WA | 700,000sf |
| Pacific Crest Cabinets, Sumner, WA | 194,000sf |

### Apartments

| | |
|---|---|
| Pinnacle Sonata, Bothell, WA | 268 units |
| Providence Apartments, Bothell, WA | 200 units |
| LionsGate I & II, Hillsboro, OR | 355 units |
| Verandas, Hillsboro, OR | 496 units |
| Portsmith Apartments, Everett, WA | 268 units |
| Jefferson at Mill Creek, Mill Creek, WA | 252 units |
| Vintage Park, Burien, WA | 521 units |

### Hospitality and Recreational Properties

| | |
|---|---|
| Suncadia Resort, Roslyn WA | 7,200 acres |
| Indian Summer, Olympia, WA | 18 holes, 460 lots |
| Pro Sport Club, Bellevue, WA | |
| Columbia Athletic Clubs | 3 properties |
| Hawthorne Suites, Kent, WA | 152 rooms |
| Edgewater Hotel, Seattle, WA | 212 rooms |

**Partial Client List (cont.)**
**Financial**
AIG Mortgage
ARCS Commercial Mortgage
Bank of America
Bank of Hong Kong
Citicorp Real Estate
Continental Savings Bank
Daiwa Securities
Frontier Bank
GMAC Commercial Mortgage
Homestreet Bank
Intervest
Key Bank of Washington
New York Life Co.
Norris, Beggs & Simpson
NorthCoast Mortgage
PNC National Bancorp
Principal Real Estate Investors
Prudential Insurance Company
Seattle Mortgage
Sterling Bank
Teachers Insurance & Annuity Associates
Union Labor Life Insurance
US Bancorp
Washington Mutual
Wells Fargo Bank
West Coast Bancorp
West One Bank

## Strickland, Heischman & Hoss Appraisal, dated July 15, 2009 with date of value of July 3, 2009

1) The appraisal utilizes the Full Build/Low Impact Alternative that includes lots on both the lower and upper bench of the site. Considering the site topography, the feasibility of the development of steep slope areas and the resulting cost of the road to provide access to the upper bench (and getting water to those lots) should have been discussed and considered in the conclusion of Highest and Best Use.

2) There is discussion of the variance necessary to include multifamily in the preliminary plat approval. This should be an extraordinary assumption.

3) The discussion of the market for homes focuses on detached single family homes (only 59 of the 344 units in the chosen development plan) and makes no differentiation of market demand and pricing between detached single family residences (sfr) and townhomes.

4) Their existing inventory shows a 2.5 to 5.0 year supply of lots based on the historical absorption and that of the past 12 months. They quote New Home Trends as estimating a 6.21 year supply of lots in the Issaquah School District. The average of all plats is sales of 0.6 lots per month. There is no discussion of the relative supply/demand factors for TH lots.

5) The discussion of demand in the multi-family market is very brief with a conclusion that states " development of this site would likely be based on future demand determined at that time". This does not provide the reader with the foundation for its eventual market value estimation.

6) The highest and best use does not address the legal non-conforming multifamily use or its feasibility in the current market (as is analysis).

7) The valuation of the multi-family site is generally reasonable, however there is no discussion as to the condition of the site being sold, it is assumed that it is a finished site with all offsites in place as it is compared with urban sites with all utilities at the street.

    The market condition adjustment is intended to adjust the value to the future date; however the reported conclusion should be referred to as the Prospective Market Value. Also, market conditions have declined since the dates of these sales and there should be some downward adjustment for market conditions prior to the trending forward to the July 2011 date of the concluded market value.

8) The sales comparison for the individual lots utilizes comparable sales with average lot sizes of 4,500, 4,500, 5,500, 6,000 and 7,800 sf, all planned for detached single family

EX. 2

development. These prices are adjusted downward for size by a range of 15-25% and are planned for detached development, not townhomes with 2,500sf average lots. More support is necessary for these adjustments which seem light.

9) Market conditions here are adjusted first downward to a current date before being projected to a future date of value. However, they are adjusted by changes in the King County median lot sale price. This is an overly broad and unreliable indicator. Again, the resulting market value should be described as the Prospective Market Value.

10) The comparable sales are more appropriately used in the analysis of the larger lots, although some of the lots lumped into Phase II include duplex/fourplex lots on the upper bench). In the narrative, these duplex/fourplex lots are referred to as " some larger lots with are designed for four unit attached structures" while the site plan shows that the 24 lots are intended to be developed with attached single family homes. Again the average value concluded for the Phase II lots should be referred to as a Prospective market value as it has been adjusted upward by 6% for market conditions through July 2012.

11) Absorption of the lots was forecast at seven to eight lots per quarter (2.3 to 2.7 lots per month). Earlier in the report the average absorption in the current plats was reported at 0.4 lots per month over the past year and 0.8 per month since opening. Additional support for this projection is necessary, as the increased need for new construction homes in this area/price point has not been quantified and compared with the existing inventory of lots.

12) Subdivision costs were estimated by comparison with a group of other smaller sites (6-67 lots). The range is $48,000 to $80,000 per lot, but appears that these costs do not include mitigation fees, which are then noted as $11,229 per lot for the subject. At the concluded cost of $65,000 per lot total for the subject, this would indicate the comparable construction cost would be about $53,800. Placement of this cost at the low end of the range, considering the subject's topography, infrastructure requirements (steep road to upper bench, water tower, etc) is not supported and appears to be understated.

13) The two phases are set up as individual cash flows, discounting the sell-out of each to July 2011 and July 2012 respectively. There are three major questions regarding these cash flow projections. First is the questionable value attributed to the attached single family (townhouse) lots. Second is the aforementioned absorption projection at 2.3 to 2.7 lots per month, which is much faster than the average for plats discussed in the report. Finally, profit was estimated at 5% of gross sales (from a range of 5-15%) and the discount rate was calculated using a band of investment which in effect provides a leveraged discount rate even though the cash flow is modeled on an all cash basis. The effect of the combination of profit and discount rate is that the IRR would be on the order of 13.8%, which is well below requirements for the sell-out phase of either of these phases.

14) The future values of the two phases are then purportedly discounted back to a December 2009 prospective date of value. However, the discounting (at a reasonable 18% rate) is for one year and two years, respectively, which would bring the value to July 2010 (July 2012 date of value discounted for two years and the July 2011 for one year), not December 2009. An additional 6 or 7 months of discounting would be required to bring the value to December 2009.

15) The final value estimated is the As Is, taking the December 2009 value, deducting $40,000 in remaining costs and then discounting another 6 months to a July 2009 date of value. This appears to be a reasonable calculation and the inferred profit of nearly 10% to go from As Is to at plat approval is reasonable. However, since the basic value At Approval is questionable, the As Is value is also questionable.

In conclusion, the property was appraised under a development plan that was not proven to be likely to gain approvals, financially feasible or the highest and best use of the site.

It appears that the market value of the attached single family (townhouse) lots may be overstated as there was no direct comparable data presented with 2,500sf average lot size and the size adjustment was not supported in the comparison with 4,000 to 7,800sf lot sales. The absorption of all units appears to be optimistic. The Discount rate applied in the two cash flows is too low by market standards and the inferred 13.8% IRR is well below typical requirements. Finally, the discounting of future conclusions of value to the estimated date of plat approval appears to be 6 months short. All of these factors would lead to an overstated value conclusion.

## Private Valuations Appraisal, dated October 30, 2009 with date of value of November 1, 2009

1) The appraisal utilizes an analysis of the site as raw land by sales comparison and the Public Interest value, which is based on the sale of Transferable Development Rights (TDR) from the subject site.

2) The discussion of zoning indicates that a variance would be necessary for the proposed clustering. It is believed that this should only apply to the multifamily element and that the clustering of the 121 single family lots plus likely a few more would be allowed by the base zoning.

3) Adversarial conditions between the property owner and the appraisal client should not pre-empt contacting the property owner as part of the assignment.

4) In the Highest and Best use analysis, an attempt should have been made to consider the development of the 14.1 acres noted as usable to the density allowed for clustering under the base zoning. That would be lower than the 251 units proposed, but looking at the 121 single family lots as the base minimum development would have allowed for reaching a conclusion as to the financial feasibility of the minimum development and also provided some additional information toward the development of TDR value later in the report.

5) The report that the City would allocate 400 TDR including incentives needs more discussion as to the basis of 344 units. The use of $12,000 per unit also could use some market support; there have been more sales in Redmond and King County that could be considered as comparable.

6) The land sale comparison analysis would more appropriately have been based on a lot count from the highest and best use, as the assumption of 251 units requires a hypothetical assumption that a variance is achieved for the additional density for the multifamily element. Considering only the 121 single family lots that are allowed under the base zoning, and a higher per unit price based on the lower density, a value similar to that concluded would be still be within the range of the comparables presented.

In conclusion, it is difficult to sign off on the value based on TDR without additional support for the price per TDR utilized, either in land residual in the highest and best use or additional comparable data from outside of Issaquah. In the Sales Comparison analysis it the value conclusion would be supported if the actual number of units allowed under the base zoning (minimum of 121 and perhaps higher incorporating the portion of the site in non-conforming multifamily use into the usable area for single family lots) is analyzed at a higher per-unit price for the resulting lower density of use.

Ex. 3

**Combined notes:** It is interesting that the PGP report was the only report that included the Port Blakely letter of intent.  The Strickland report was the only one of the three to note the 300'x600' easement to the Sportsman Club.