Diana K. Carey, WSBA #16239
Michael M. Feinberg, WSBA #11811
Michaelanne Ehrenberg, WSBA #25615
Karr Tuttle Campbell
1201 Third Ave., Suite 2900
Seattle, WA 98101
Telephone: (206) 223-1313
Attorneys for Regal Financial Bank

The Honorable Karen A. Overstreet
Chapter 11
Hearing Date: January 21, 2010
Hearing Time: 9:30 a.m.

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

In Re:

WELLINGTON PARK POINTE LLC,

    Debtor.

NO. 09-21610-KAO

REGAL FINANCIAL BANK'S HEARING BRIEF

In accordance with the Court's Order Setting Evidentiary Hearing and Deadlines, Regal Financial Bank ("Regal"), submits the following hearing brief.

## **INTRODUCTION**

This is a single asset real estate case. The sole asset of the Debtor, Wellington Park Pointe LLC ("Debtor" or "WPP"), is an undeveloped 102.6 acre parcel of real property (the "Property") in Issaquah, Washington This matter comes before the court for a final hearing pursuant to Section 362(e)(1) on Regal's Motion for Relief from the Automatic Stay. Regal seeks relief from stay based on (1) Bankruptcy Code Section 362 (d)(2) on the grounds there is no equity in the Property and it is

REGAL FINANCIAL BANK'S HEARING BRIEF - **1**
#736290 v2 / 32389-005

*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

not necessary for an effective reorganization, and Section 362 (d)(1) for cause, as Regal Bank is not adequately protected.

Significantly, the Property does not have preliminary plat approval. Although a final environmental impact statement ("***FEIS***") has been issued, this does not guarantee that the Debtor will be able to (1) obtain preliminary plat approval to build either or both of the alternatives indicated on the FEIS, or (2) build to the density of either of the alternatives if it does obtain plat approval. Additionally, conditions imposed by the City of Issaquah ("***City***") as part of the plat approval process may make development of this Property economically unfeasible.

## **FACTS**

**A.     Regal's Secured Debt**

Regal holds a deed of trust against the property that was recorded August 14, 2003, King County Recording No. 20030814001426, and modified by instruments recorded May 9, 2006, King County Recording No. 2006050901568 and on July 18, 2007, King County Recording No. 20070116000063 (collectively the "***Deed of Trust***"). The Deed of Trust secures a promissory note, dated December 12, 2008, in the principal amount of $10,800,000. The note provides for interest at a non-default rate of 8.75% computed on a 365/360 basis and a default rate of 18% per annum. The balance owed Regal as of **$12,834,107.17**, computed as follows:

| Cost/Fee Description | Amount |
|---|---:|
| Principal Outstanding | $10,773,000.00 |
| Interest Amount | 1,961,766.00 |
| Late Charges | 4,068.75 |
| Appraisal Fee | 16,000.00 |
| Legal Costs | 51,145.45 |
| Title-Datedowns | 13,532.87 |
| Appraisal Review | 275.00 |
| Professional Fees | 14,319.10 |

*Law Offices*
KARR · TUTTLE · CAMPBELL
*A Professional Service Corporation*
**1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028**
**Telephone (206) 223-1313, Facsimile (206) 682-7100**

| **Total Amount Due** | **$12,834,107.17** |
|---|---|

B.  **The Subordinate Liens**

The Debtor's interest in the Property is subject to more than $**1,795,808** in subordinate liens:

| | |
|---|---:|
| Property taxes 2009 (w/o interest and penalties) | $    57,454.70 |
| Park Real Estate Investments, LLC (principal only) | 1,100,000.00 |
| Stanford Park Pointe, LLC | 513,781.26 |
| Golder Associates | 37,329.68 |
| Pacific Engineering Design LLC | 87,242.10 |
| **TOTAL Subordinate Liens** | **$1,795,807.74** |

The total encumbrances against the Property exceed **$14,629.914.91**.

C.  **The Property**

The Debtor acquired the Property from Sunrise Ridge Limited Partnership (one of the Debtor's two members) on March 31, 1999, and it has been trying to develop the Property ever since. The Property has had a tortured history. Development of the Property has been opposed by the community at large, who would prefer to see the Property remain undeveloped. The following is a brief history of the project:

- In 1994 the King County Comprehensive Plan designated the northerly 67 acres of the Park Pointe property as "Urban" and included the acreage as part of Issaquah's ultimate Urban Growth Area. (The southerly 35 acres were already within the Issaquah city limits.)

- In 1995 Issaquah adopted its own Comprehensive Plan that identified these 67 acres as a Potential Annexation Area.

- In 1996 Sunrise Ridge Limited Partnership and the City entered into a Preannexation Agreement that required the parties to negotiate in good faith toward an Urban Village Development Agreement for the site. The City annexed the 67 acres later that year.

- In 1997, Issaquah's Comprehensive Plan was amended to designate Park Pointe as suitable for a future Urban Village. Work began the following year on an environmental impact statement (EIS) for the 102 acre Park Pointe Urban Village.

- By 2001, significant public opposition had emerged to development of the Park

*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Pointe property as an Urban Village. In addition, construction of the proposed new SE Bypass was seen as crucial for the Property, in order to mitigate the traffic impacts of a Park Pointe Urban Village. Also in 2001 the City Council ended the Park Pointe Vision to declare that the preferred land use for the site was public or private open space.

- In 2003, the Debtor suspended work on the Park Pointe Urban Village EIS, pending the outcome of the SE Bypass decision.

- In 2005, the City Council amended the Issaquah Comprehensive Plan to remove the Urban Village land use designation from the Property and redesignate the site from Low Density Residential/Urban Village to Low Density Residential.

- As amended, the Comprehensive Plan now states that "The design and development of Park Pointe shall protect the sensitive lands mentioned above, maximize open space, encourage innovative and diverse housing, create strong linkages to adjacent neighborhoods, and encourage use of public transportation and facilities. Development of the Park Pointe subarea also requires providing usable active or passive recreation space located outside of sensitive areas and their buffers .... [T]he appropriate land use for the subarea is public or private open space. The entire area should remain undeveloped to fully protect the sensitive land."

- In 2006 and 2007, the Debtor applied to the City for a Master Site Plan and accompanying preliminary plat for a revised Park Pointe low-density residential proposal on the northerly 67 acres. (The southerly 35 acres, which contain extensive wetlands areas, were excluded.). Preliminary work on a new Draft EIS began.

- In 2008, the City Council decided not to move forward with the SE Bypass.

- In the fall of 2008, WPP, the City, and Port Blakely (developer of the Issaquah Highlands Urban Village) explored a potential Transfer of Development Rights ("TDR") from the Debtor to Port Blakely, whereby Port Blakely would purchase some or all of Debtor's development rights in the Property and transfer the rights to Issaquah Highlands. The City was a strong supporter of this concept, which failed to come to fruition, largely as a result of Microsoft's decision not to acquire and develop further office space in Issaquah Highlands.

- In January 2009, the City issued its Draft EIS for Property. The document analyzes two principal low-impact-development ("LID") alternatives:
    - the "Lower Bench LID Alternative" of 251 units clustered on the 14 acres lower bench ;
    - The "Full Build Alternative" of 344 units developed on both the upper and lower benches clustered on 32 acres.

- On October 30, 2009, the City issued the Final EIS for the Property.

REGAL FINANCIAL BANK'S HEARING BRIEF - **4**
#736290 v2 / 32389-005

*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

The Debtor still needs to negotiate a development agreement and obtain approval of a Master Site Plan before it can obtain preliminary plat approval of either of the alternatives analyzed in the EIS. Although the Debtor claims that obtaining preliminary plat approval will take 12-18 months, according to the City, the negotiation and finalization of a development agreement typically takes two years or more. During this process, the City will impose conditions on the development that may lead to significant additional costs or reduce the number of units that the Debtor will be able to build, many of which are enumerated in the FEIS.

There is also a significant question whether the Debtor and its corporate parent and affiliates have the financial resources to complete this project. The Debtor is entirely reliant on its parent for its cash needs. However, the audited financial statements of the Debtor's parent, Triple Five Development Corporation nka International Investment Syndications, Ltd., indicate that "the Company has incurred recurring loses cumulating to a deficit of $121,441,816, has used significant cash in support of its activities, has events of default on all its financing obligations . . . ." According to its auditors "[t]hese conditions raise doubts about the Company's ability to continue as a going concern."[1]

## ARGUMENT

### I. THE WEIGHT OF THE EVIDENCE DEMONSTRATES THERE IS NO EQUITY IN THE PROPERTY

#### A. It Is Doubtful That it is Economically Feasible to Develop the Property

The Debtor does not have preliminary plat approval, and whether the debtor will be able acquire the approvals and permits necessary to develop the property and whether the Debtor will be is

---

[1] **Ex. 11, Grant Thorton Auditor's Report (2/13/09), p.1.**

REGAL FINANCIAL BANK'S HEARING BRIEF - 5
#736290 v2 / 32389-005

*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

economically feasible is at best speculative. According to the City, the preliminary plat approval and development agreement process will likely take over two years, and it is not until near the end of that process will it be known what, if any, development of the Property is possible, particularly, in the present economic environment. During this period more than $**1,775,000** of interest will accrue on the Regal debt at the non-default rate of interest.

Contrary to the Debtor's optimistic pronouncements, the issuance of a FEIS is no assurance that the Debtor will be able to obtain preliminary plat approval, build the number units of either the Lower Bench of Full Build Alternatives analyzed in the FEIS, or whether because of the conditions imposed by the City, development of the property is economically feasible.

In order to obtain the entitlements that the debtor is seeking as part of the preliminary and final plat approval process, the Debtor will need to negotiate with the City and obtain approval of a Master Drainage Plan and a Master Site Plan. The Debtor will also need to enter into a binding development agreement with the City in order to be able to take advantage of the City's cluster housing provisions in order to achieve the density it seeks.[2] The development agreement process is inherently open-ended and uncertain. There is no assurance that the Debtor and the City will ultimately be able to reach agreement on its terms.

One required element of such a development agreement under the City Code is the inclusion of "affordable housing."[3] The number and location of affordable housing units that the City will require

---

[2] Development Agreements are authorized by state statute as a means of establishing conditions of approval, mitigating measures and implementing procedures for the development of relatively long term projects, RCW 36.70B.170-210. The City's cluster housing provisions, including the requirement for a development agreement are found in IMC § 18.070420. Issaquah has amplified the general statutory requirements for development agreements specifically for use with cluster housing developments. IMC § 18.07.420(C).

[3] IMC § 18.07.420(C); "**Affordable** housing" is defined in IMC § 18 02.100. Housing is considered "affordable" if it costs no more than 30% of a family's income Affordable housing is further divided into low, moderate, and median, and high income categories.

REGAL FINANCIAL BANK'S HEARING BRIEF - **6**
#736290 v2 / 32389-005

*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

as part of the development agreement is at present unknown. Depending on the number of affordable units, the financial feasibility of the project could be significantly affected. In other words, the Debtor may be forced to offer affordable units for sale at a price well below the Debtor's cost per-unit basis, which would make development of the Property economically infeasible. It is also likely that as part of the development agreement negotiation, the City will impose other conditions that may adversely impact the economics of the project.

The situation is further complicated by the fact that the Debtor will need to obtain approval of a Master Site Plan. A Master Site Plan approval requires review by the City's Development Commission, a citizen board akin to the Planning Commission in most cities. That Development Commission review may take considerable time, as the members often focus on design details at great length and advocate for various project revisions. As matters now stand, because of the Property's challenging topography, the FEIS outlines a number of significant mitigation conditions that are, out of the ordinary, will be costly to mitigate, and which will make this subdivision unusually expensive to develop. The Property is located on a hillside with a significant amount of slope in excess of 40% and encompasses a number of critical areas and wetlands. Based on the FEIS, a water tower and booster pump station will be required. The FEIS also suggests, a expensive masonry wall the constructed to mitigate noise from the adjacent gun range as well as extra sound insulation in the buildings. Development of the upper bench full build alternative will require construction of road traversing a steep hillside (with slopes of 40% or more) with large and costly retaining walls. The Debtor's plans to date are conceptual in nature. It has done no detail costing or engineering of the improvements and infrastructure that the FEIS requires. Regal will present expert engineering testimony based on the Debtor's conceptual plans, showing that development of the plat is not economically feasible in the

current economic environment and the highest and best use is to pursue the sale of the Property's TDRs.

B. **Regal Will Establish That The Debtor Lacks Equity In The Property**

In order to satisfy the statutory requirements for relief from stay, Regal has the burden of demonstrating that the Debtor lacks equity in the Property. *§362(g)*; *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375, 108 S.Ct. 626 (1988). Under the first prong of § 362(d)(2), a debtor lacks equity in the property when the sum of the total debts secured by liens against the property exceed its value. § 362(d)(2)(A); Stewart v. Gurley, 745 F.2d 1194, 1195 (9th Cir. 1984) (holding majority rule is the proper definition of "equity"); see also In re Faires, 34 B.R. 549, 551 (W.D. Wash. 1983).

Because the Debtor lacks preliminary plat approval, it is totally speculative, whether, when, how many units and of what kind the Debtor will be able to build. The Property's topography presents some serious challenges and the amount of affordable housing and the other conditions the City may impose as part of a development plan are totally unknown. Regal has obtained an appraisal from Private Valuations, Inc. ("PVI Appraisal"), which values the Property at $4,500,000 based on the value of the TDRs associated with the Property.

As noted in the PVI Appraisal, with a surfeit of partially completed development sites on the market, it is a buyer's market and no rational developer in this economic environment will choose to purchase this property (with all the inherent unknowns) over the many other subdivision projects on the market that do not have these risks. There is absolutely no current evidence that the Property, in the current economic environment, can be developed and return a profit to the developer after paying

*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
**1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028**
**Telephone (206) 223-1313, Facsimile (206) 682-7100**

off the secured liens against the Property. Accordingly, it is doubtful that development of the Property is its highest and best use, and that the Property has any true value other than based on its TDRs.

At the time of submitting this brief, the Debtor has not submitted its appraisal. At the preliminary hearing, the Debtor relied on an appraisal done by Donald Heischman (the "Strickland *Appraisal*"). That appraisal contains a internal error in its discounting computation. When that error is taken into consideration, after deducting costs of sale, the Debtor's equity in the Property is **negative in excess of $2,400,000**. The Strickland Appraisal assumes that the Debtor will be able to build all of the 344 units in the full build alternative and does not make any adjustment for the affordable housing units that are required by the City Municipal Code. The Strickland Appraisal also does not take into account the Property's topography and additional infrastructure costs required by the mitigation measures already identified in the FEIS. In addition, the Strickland Appraisal suffers from many other deficiencies noted in the Desk Review performed by Richard Briscoe of GVA Kidder Matthews.

The Strickland Appraisal does note that the Debtor did not provide the appraiser with any cost information. In discovery, Regal requested any costing or engineering estimates made by the Debtor, and it appears from the discovery responses that there are none. Regal will present expert engineering evidence that, based on the conceptual drawings the debtor used in the FEIS and those provided in discovery, it is not economically feasible to develop the Property, and that the highest and best use of the Property is the sale of its transferable development rights.

C. **The Debtor Cannot Demonstrate That The Property Is Necessary To An Effective Reorganization**

Once Regal establishes a lack of debtor equity, the Debtor has the burden of establishing that the Property is necessary to an effective reorganization. *§362(g)*. It is not enough to carry this burden

REGAL FINANCIAL BANK'S HEARING BRIEF - **9**
#736290 v2 / 32389-005

*Law Offices*
KARR · TUTTLE · CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

for the debtor to show that "if there is conceivably to be an effective reorganization, this property will be needed for it." *Timbers of Inwood Forest Assocs., Ltd.* 484 U.S. at 375. Rather, the debtor must show "that the property is essential for an effective reorganization *that is in prospect*." *Id.* at 376 (emphasis in original).

This is a single asset real estate case. If there is equity in the property, the Debtor will need to propose a feasible plan that will pay all secured creditors in full with interest. 11 U.S.C. § 1129(a). The Debtor cannot show that there is an effective reorganization *in prospect*. The Debtor, according to the City, is at least two years from obtaining preliminary plat approval. The Debtor has not done any cost studies of the site improvements it already is required to make. Until that preliminary plat and permitting process is substantially completed, the number of affordable housing units determined, and the other development requirements known, and the cost of the required infrastructure priced, it is not possible to determine whether development of the Property is economically feasible. The Debtor cannot demonstrate whether the Property is necessary for an effective reorganization in prospect, because it will not know whether the property can be economically developed for at least two years. Therefore the Court should grant Regal's motion for relief from the automatic stay so that it may pursue its remedies under state law.

## II. The Debtor Cannot Prove that Regal is Adequately Protected.

There is no clear definition of what constitutes "cause" under 11 U.S.C. § 362(d)(1). Courts therefore have discretion to determine what cause is, based upon a case-by-case basis. In re Castlerock Properties, 781 F.2d 159, 163 (9th Cir. 1986). Lack of adequate protection constitutes "cause" for lifting the stay to permit foreclosure. In re McPherson, 225 B.R. 203, 204 (Bankr. D. Idaho 1998).

REGAL FINANCIAL BANK'S HEARING BRIEF - **10**
#736290 v2 / 32389-005

*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Beyond the value of the property, a court will consider whether a creditor has some other form of adequate protection, which is defined in § 361. Adequate protection may be provided by periodic payments, additional or replacement liens, or such other relief that will result in the realization of the "indubitable equivalent" of the entity's interest. § 361(1), (2), and (3). Periodic payments (§ 361(1)), for example, can prevent the erosion of secured debt where interest accrues "without any concomitant increase in value." Castle Ranch of Ramona, Inc, 3 B.R. 45, 48.(S.D. Cal. 1980). In order to adequately protect a creditor, the debtor must be able to pay this interest on a monthly basis. Id.

The Debtor is not proposing to make any payments to Regal but instead is relying on the value of the Property. Interest is accruing on Regal's secured claim on the non default rate at approximately $74,064 per month. If the preliminary plat process takes two more years, this means another $1,777,545 in interest will accrue on Regal's debt; if the process takes three years, another $2,666,318 in interest will accrue. At the conclusion of the process, there is no assurance that development of the Property will be economically feasible. The Debtor and its parent are in severe financial straits. There is a legitimate question whether they have the wherewithal to even fund the costs necessary to obtain preliminary plat approval. Indeed, the Debtor requested that Regal pay for the remaining entitlement costs because the Debtor and its parent claimed an inability to pay them.

This is a fully leveraged project. The Debtor has been playing dice with Regal's money entirely too long. It has no right to continuing to gamble with the Bank's money unless it can demonstrate that a reorganization is in prospect and the Regal is adequately protected. This is cannot do. Regal is entitled to relief from stay for cause, based on a lack of adequate protection.

*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

## CONCLUSION

Regal respectfully requests that the Court grant Regal's motion for relief from the automatic stay, as it has demonstrated that the Debtor lacks equity in the Property, no effective reorganization of Wellington is possible, and the value of the Property does not adequately protect Regal's interest in the Property.

DATED this 11th day of January, 2010.

KARR TUTTLE CAMPBELL

By: /s/ Michael M. Feinberg
    Diana K. Carey, WSBA #16239
    Michael M. Feinberg, WSBA #11811
    Michaelanne Ehrenberg, WSBA #25615
    Attorneys for Regal Financial Bank

REGAL FINANCIAL BANK'S HEARING BRIEF - **12**
#736290 v2 / **32389-005**

*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100