**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | | |
|---|---|---|
| In re: | ) | Honorable Karen M. Overstreet |
| | ) | Case No. 09-21610 |
| WELLINGTON PARK POINTE LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | PRE-HEARING BRIEF OF DEBTOR AND |
| | ) | DEBTOR-IN-POSSESSION WELLINGTON |
| | ) | PARK POINTE LLC |
| | ) | |

Pursuant to this Court's Order Setting Evidentiary Hearing and Deadlines,[1] Wellington Park Pointe LLC, the Debtor and Debtor-in-Possession in this case ("Debtor" or "WPP"), respectfully submits the following pre-hearing brief.

## I.      PREFATORY STATEMENT

Regal Financial Bank ("Regal" or "Bank"), the senior secured lender of WPP, has filed a Motion for Relief from the Automatic Stay ("Stay Relief Motion") seeking entry of a court order that will allow the Bank immediately to foreclose upon WPP's only asset, a 102.6 real estate development located in Issaquah, Washington.  Regal *claims* that it has two separate and independent legal bases for the requested relief:  *first,* that there is no equity in the subject property *and* the property is not necessary to effective reorganization; and *second*, that Regal is not adequately protected.  If Regal is to prevail on the second ground, the Court must find a lack of adequate protection.

---

[1] Pursuant to the Court's Order Setting Evidentiary Hearing and Deadlines, Debtor's pre-hearing brief was due on January 15, 2010.  Due to a complete power outage and computer failure at the offices of Butler Rubin on the evening of January 14, 2010, through part of the day on January 15, 2010, the parties agreed to allow Debtor to file its pre-hearing brief by January 16, 2010 at noon.

Regal cannot prevail under either of these theories. If the Bank is to prevail on the *first* of the theories, the Court must find *both* that there is no equity in the property *and* that the property is not necessary to an effective reorganization. The record at trial will establish the exact opposite. It will strongly support a finding that there is a significant equity cushion in the property, above and beyond the aggregate amount of the claims of all lienholders. Moreover, it will demonstrate that the Debtor can successfully organize, with payment in full of all secured and unsecured claims, within a reasonable time frame. In fact, the evidence will show that, in its determined effort to foreclose on the property and, hence, to prevent the Debtor from obtaining the few remaining legal entitlements to development, Regal has embarked upon a highly destructive course of action that will be inimical to the interests of junior lien creditors, unsecured creditors, and interest holders. Indeed, that destructive course of action may well redound to the detriment of the Bank as well.

Regal's *second* stay relief theory is both factually unsupportable and legally baseless. Indeed, Regal's claim that it is not adequately protected is based upon an utterly false characterization of the law. Regal claims that it is undersecured. It never claims that its collateral is diminishing in value. In that circumstance, Regal is not entitled to adequate protection.

Moreover, in determining whether or not Regal is adequately protected by a sufficient equity cushion, the Court need consider only the difference in value between the Regal claim and the value of the property. In this case, as the evidence will demonstrate, Regal's equity cushion is more than $6 million. That $6 million cushion is almost one-half the amount of the entire Regal claim and would be sufficient to absorb the accrual of interest by Regal at the default rate for approximately 40 months.

For the foregoing reasons, as more fully discussed below, the Court should enter an order denying Regal's Stay Relief Motion.

## II.    FACTUAL BACKGROUND

The parties are currently conducting formal discovery.  At the time of writing of this brief, a number of depositions have yet to be taken and additional documents may yet be produced.  It is possible that some witnesses will not even be deposed prior to the commencement of the hearing.  Discovery will almost certainly yield additional relevant facts.  WPP expressly reserves the right to modify and to amplify its presentation of the facts after the completion of discovery and at the hearing.

At present, however, it appears that WPP's factual case will include at least the following:

### A.  The Debtor and Its Property.

1.      WPP is a Washington limited liability company that was established in 1998. Its members, each of which owns a 50% interest in the Debtor, are Sunrise Ridge Limited Partnership and Wellington Organization Ltd.  WPP was created to acquire and develop a new, 102.6 acre, master planned residential community in Issaquah, Washington (the "City").

2.      The Park Pointe property ("Park Pointe" or the "Property") is located in a highly desirable area.  It is in a beautiful foothill setting and is located near downtown Issaquah, schools (Issaquah High School is directly adjacent to the Property), shopping, freeways, and Lake Sammamish State Park, a 512 acre public park featuring some 6,858 feet of waterfront, boating and water sport activities, trail systems, biking paths, and breathtaking vistas.  Of Park Pointe's 102.6 total acres, less than 40 acres can be built on. The remaining portion of the Property

consists of picturesque wetlands and other natural areas that will not be disturbed by the proposed construction of residential units.

3.　　Under the existing preliminary site plan, Park Pointe will consist of between 251 and 344 residential units, depending upon which of two development alternatives the Debtor elects to pursue.  The Debtor's preferred alternative is the Lower Bench Low Impact Development Alternative, based on the assumption that the Upper Bench is acquired for public use and open space by the City or another entity.  Should such acquisition not occur, the Full Build Low Impact Development would be the Debtor's preferred alternative.  Some of the units will be freestanding single-family homes; some will be attached single-family homes; and some will be in multi-family apartments and condominiums.

**B.  The Status of the Entitlement Process.**

4.　　To date, the development of the Property has consumed more than ten years.  This extended time span has resulted from the need to satisfy the strict and often-changing laws and other requirements of a number of governmental agencies which oversee such matters as the impact of the proposed development on the environment, neighborhood traffic, and land and water use.

5.　　During this lengthy period, WPP and its affiliated entities have remained committed to the project through the persistent and generous investment of time, energy, and money.  In 2006, the City issued transportation concurrency and water supply availability certificates for the Property.  Finally, on October 30, 2009, less than three months ago, WPP received the Final Environmental Impact Statement ("FEIS") from the City.  The Property is already zoned for single-family small lot usage.

6.      The issuance of the FEIS is a highly favorable and significant milestone in the development of the Property.  After more than ten years of planning, the fulfillment of numerous administrative and regulatory requirements, and the expenditure of more than $17,000,000 in cash in order to acquire and plan the development of the Property, and obtain necessary regulatory approvals (the "Entitlements" and the effort to obtain such Entitlements, "Entitlement Process"), WPP is at last ready to enter the final phase of the Entitlement Process.

7.      This final phase of the Entitlement Process will involve the effort to obtain City approval of the Master Site Plan and Preliminary Plat and the negotiation of the Development Agreement with the City.   Before attaining these goals, WPP will complete soil and water testing in connection with the possible future relocation of a pond and revise its Master Site Plan and Preliminary Plat in accordance with the FEIS.

8.      WPP has good reason to believe that, with requisite financing, it will successfully complete this final development phase.  Quite obviously, the City would not have issued the FEIS less than three months ago if it intended to block the proposed development.

### C.  The Value of the Property.

9.      Within the past three years, there have been no fewer than eight separate appraisals or valuation analyses (in the aggregate, the "Appraisals") of the Property.  Seven of the eight Appraisals were completed in 2009, four within the past six months.  Regal commissioned all but the last of the 2009 and 2010 Appraisals.

10.      The first of the Appraisals, which was issued by PGP Valuation Inc. ("PGP") and signed in January of 2007 by two qualified Members of the Appraisal Institute ("MAI"), was in the amount of $29 million.

11.     The second of the Appraisals was a January 2009 PGP appraisal in the amount of $17.6 million.  That January 2009 appraisal, which was on an "as is" basis, was submitted by Regal to an independent, third-party consultant, who agreed with its conclusion.

12.     The third and fourth of the Appraisals, which were prepared by PGP as of January and March of 2009, were in the amount of $15,200,000.  None of the PGP Appraisals performed in 2009, all of which were commissioned by Regal, took into account the value of the Upper Bench lots.

13.     The fifth Appraisal was performed for Regal in July 2009 by Strickland Heischman & Hoss, Inc ("SHH").  This, also, was an MAI appraisal.  In the SHH study, which is just six-months old and which the Bank both commissioned and immediately shared with WPP at the time of completion, SHH concluded that the Property has a current market value of $14,630,000 and a value of  $16,035,000 assuming the Preliminary Plat is approved by the City.

14.     Regal obtained the sixth of the Appraisals, a November 2009 report, from an entity named Private Valuations, Inc. ("PVI").  The PVI report was not prepared by an MAI appraiser.  The Bank commissioned the PVI report in anticipation of this case.  It relied upon the PVI appraisal, which valued the Property between $4.5 million and $5.0 million, in the November 24, 2009 Stay Relief Motion.

15.     Within three weeks after appending the PVI report to its Stay Relief Motion, Regal filed a Reply in Support of Motion for Relief from the Automatic Stay ("Reply") expressly discrediting and repudiating PVI's valuation conclusions.  In doing so, Regal relied upon yet another report ("Briscoe Appraisal"), styled as a "desk review," that made no finding of value whatsoever.

16.     WPP has commissioned an appraisal of its own in connection with its opposition to the Stay Relief Motion.  This appraisal was completed on Friday, January 15, 2010.  It was performed by Jeffrey Sherwood, an MAI ("Sherwood Appraisal").  Sherwood has concluded that, on an as-is basis, as of Thursday, January 14, 2010, the Property has a fair market value of $18,920,000.

17.     In reaching his valuation conclusion, Mr. Sherwood reviewed all of the prior 2009 Appraisals, conducted his own independent research and analysis, and relied upon absolutely up-to-the-minute construction and engineering cost data supplied to him on January 14, 2010, by Pacific Engineering, a top-notch engineering firm.

18.     In his appraisal, Mr. Sherwood assesses the various approaches and analyses used in the myriad appraisals and appraisal reviews commissioned by Regal.  He notes that Briscoe provides no value conclusions of his own, and that despite Briscoe's criticisms of aspects of the other Regal appraisals, he offers no conclusion as to whether any of those appraisals provides an accurate valuation.  He notes also that the PVI valuation includes only the "Lower Bench" in its assessment of value, does not attribute any value to the Property's current entitlements, treating the property as "raw land," and then applies a "Public Interest" value analysis not adopted by any of the other appraisers and unsupported by comparable market data.   While the Strickland and PGP appraisals were performed in a more reasonable manner, they are less current than Mr. Sherwood's appraisal.  Moreover, the Strickland valuation uses a discounted cash flow analysis to arrive at its final value without using a Sales Comparison Approach to further support that valuation.  Although PGP's appraisals were "mostly complete" in Sherwood's analysis, they are less current than Sherwood's analysis and flawed in considering only the "lower bench" of 251 units, as opposed to the 344-unit "Full-Build" option that is the preferred alternative in the FEIS.

Sherwood's appraisal analyzes the entire proposed development with the benefit of the most recent cost estimates and additional sales data in support of his conclusion that the "as is" value as of January 14, 2010, is $18,920,000.

19.     The following chart summarizes the conclusions of the various appraisers.

| The Appraisals | | | |
|---|---|---|---|
| | **Date** | **Appraiser** | **Amount** |
| 1<br>Debtor – ordered | January 2007 | PGP | $29 million |
| 2<br>Bank - ordered | January 2009 | PGP | $17.6 million |
| 3<br>Bank – ordered | January 2009 | PGP | $13.8 million (as is)<br>$15.2 million (with preliminary plat approval) |
| 4<br>Bank - ordered | March 2009 | PGP | $13.8 million (as is)<br>$15.2 million (with preliminary plat approval) |
| 5<br>Bank - ordered | July 2009 | SHH | $14.63 million (as is)<br>$16.035 million (with preliminary plat approval) |
| 6<br>Bank - ordered | November 2009 (at time of filing of Stay Relief Motion) | PVI | Between $4.5 million and $5.0 million |
| 7<br>Bank - ordered | December 2009 | Briscoe | No opinion of value |
| 8<br>Debtor – ordered | January 2010 | Sherwood | $18.92 million |

**D. Consensual and Non-Consensual Lien Claims; the "Equity Cushion."**

20.     On the Petition Date, WPP was indebted to three creditors holding consensual liens against the Property (Regal, Stanford Park Pointe, LLC ["Stanford"] and Park Real Estate Investment, LLC ["Park"]) and three creditors holding non-consensual liens (King County ["County"], Golder Associates ["Golder"], and Pacific Engineering Design LLC ["Pacific"]). Upon the date of the Petition, the aggregate amount of the Lienholders' claims, including principal and accrued and unpaid interest, was $14,143,432.  The following chart summarizes the claims of the Prepetition Lienholders as of the date of the Petition.

| Claims of Prepetition Lienholders | | |
|---|---|---|
| **Lien Priority** | **Creditor** | **Amount** |
| First | Regal | $12,361,407 |
| Second | Stanford | $500,000 |
| Third | Park | $1,100,000 |
| Fourth | County | $57,454 |
| Fifth | Golder | $37,329 |
| Sixth | Pacific | $87,242 |
| | | **$14,143,432** |

21.     The July 2009 appraisal, which was commissioned by the Bank, placed a value of $14,630,000 on the Property before approval of the Preliminary Plat.  That amount is approximately $500,000 greater than the aggregate amount of the claims of the Lienholders. Moreover, under that appraisal, the Property value is $1.4 million greater after the Preliminary Plat is approved.  This is the appraisal that Regal both obtained and shared with WPP less than six months ago.

22.     The Sherwood appraisal, which is based on the newest and most accurate data, values the property at $18,920,000.  That amount is $4,776,568 greater than the aggregate amount of the Lienholders' claims.  Under the Sherwood Appraisal, all liens against the Property are "cushioned" by an amount equal to more than 25% of the value of the Property.

23.     Moreover, if one restricts the "equity cushion" analysis solely to the claim of the Bank, Regal is protected by a cushion of $6,558,593.  Even if Regal were permitted to accrue interest at the 18% "default rate" provided for in its documents, this cushion would absorb any and all such interest accruals for a period of 40 months.

### E.  The Property is Necessary for an Effective Reorganization.

24.     Regal's claim that the Property is not necessary to an effective reorganization is patently false.

25.     The Property is WPP's sole asset.  Without the Property, WPP cannot reorganize.

26.     Moreover, the Property is currently worth $18,920,000, on an *as-is* basis. Without any further entitlement work, a sale of the Property will generate proceeds that are sufficient to pay all secured and unsecured claims in full and to provide a multi-million dollar return to interest holders.

27.     If the Debtor is permitted to complete the Entitlement Work, the value of the Property will be even greater than the amount of the Sherwood Appraisal.

28.     The Entitlement Work can be completed a matter of months at the relatively modest cost of approximately $500,000.

29.     If, on the other hand, Regal is permitted to foreclose upon the Property, it will undoubtedly "credit bid" some or all of the amount of its claim at the deed of trust sale, all other

secured and unsecured creditors will recover nothing, and Regal will be permitted to recover a windfall upon the subsequent sale of the Property.

## II.     LEGAL ARGUMENT

### A.  Regal is Not Entitled to Relief from the Automatic Stay Under Section 362(d)(2).

30.     Regal argues that the stay should be lifted pursuant to 11 U.S.C. § 362(d)(2) because:  (a) the Debtor has no equity in the Property, and; (b) the Property is not necessary to an effective reorganization.  The Court must find both these standards to be met in order for the stay to be lifted.  Regal cannot meet either standard.

31.     The Sherwood appraisal values the property at $18,920,000.  That amount is more than $4.7 million greater than the aggregate amount of the claims of the Lienholders.  In reaching his valuation conclusions, Sherwood relies upon utterly up-to-date data regarding construction costs, utterly up-to-date data regarding issuance of the FEIS and the current status of the entitlement process and a complete review of all prior appraisals.

32.     Regal asserts that it is owed a total of $12,834,107.17, which includes the principal amount, interest, late charges, appraisal fee and review, legal costs, title-datedowns and professional fees.  Even using Regal's number and the subordinate liens, the Sherwood appraisal establishes that there is still a $4.5 million equity cushion.  Regal has failed to meet its burden of showing that there is no equity in the Property and its motion for relief from the stay should be denied.

33.     As Regal has not met its burden of showing that there is no equity in the Property, the inquiry under Section 362(d)(2) need go no further.  However, Regal's argument that the Property is unnecessary to the Debtor's reorganization similarly fails.  Regal contends that it is not possible to determine whether development of the Property is economically feasible.  In

support of its position, Regal notes that the Debtor has not done any cost studies of the required site improvements. The Debtor has obtained utterly current cost estimates, which were relied upon by Mr. Sherwood in his appraisal.

34. Regal's claim that the Property is not necessary to an effective reorganization is patently false. The Property is WPP's sole asset. Without the Property, WPP cannot reorganize. Moreover, the Property is currently worth $18,920,000, on an *as-is* basis. Without any further entitlement work, a sale of the Property will generate proceeds that are sufficient to pay all secured and unsecured claims in full and to provide a multi-million dollar return to interest holders. Such a sale could, by itself, be the basis of a highly successful reorganization.

35. If the Debtor is permitted to complete the Entitlement Work, the value of the Property will be even greater than the amount of the Sherwood Appraisal. The Entitlement Work can be completed in a matter of months at the relatively modest cost of approximately $500,000. If the Entitlement Work is completed, an ensuing sale would be the basis of an even more successful reorganization.

36. If, on the other hand, Regal is permitted to foreclose upon the Property, it will undoubtedly "credit bid" some or all of the amount of its claim at the deed of trust sale, all other secured and unsecured creditors will recover nothing, and Regal will be permitted to recover a windfall upon the subsequent sale of the Property.

37. Under 11 U.S.C. § 362(d)(2)(B) -- whether the property is necessary to an effective reorganization -- there must be "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Texas v. Timber Wood of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375 (1988). In the early stage of the case, which is from the petition date until shortly before the expiration of the debtor's exclusivity period to propose a plan, the debtor

must show only that "a successful reorganization within a reasonable time is 'plausible.'" *In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, (B.A.P. 9th Cir. 1994); *In re Holly's Inc.*, 140 B.R. 643, 643 n. 91 (Bankr. W.D. Mich. 1992). Given that we are only two months into the 120 day exclusivity period, Debtor must only show that a successful reorganization is plausible within a reasonable time. *Id.*

### B. There is No "Cause" to Lift the Automatic Stay.

38.     Regal also attempts to argue that there is "cause" to lift the stay under 11 U.S.C. § 362(d)(1), as it claims that there is no "adequate protection" for Regal's secured interest in the Property. Regal's claims regarding adequate protection are flat wrong from both a legal and a factual standpoint.

39.     As noted in the foregoing section, there is a $4.7+ million equity cushion above and beyond the aggregate amount of all secured claims.

40.     For purposes of adequate protection analysis, however, one need not even consider the claims of creditors whose liens are subordinate to those of Regal. *In re Mellor*, 734 F.2d 1396, 1401-1402 (9th Cir. 1984) (holding that subordinate liens "cannot be considered in determining whether the interest of a senior lienholder is adequately protected," and overturning bankruptcy court for erroneously including junior lien in calculation of equity cushion).

41.     Hence, the cushion enjoyed by Regal is more than $6.5 million, which is great enough to cover accruing interest at even the 18% default rate under the Regal loan for more than 40 months.

42.     On a percentage basis, the $6.5 million cushion is equal to 34% of the value of the Property. That is a more than sufficient cushion for the maintenance of the automatic stay. *See In re McCombs Properties VI, Ltd.*, 88 B.R. 261 (Bankr. C.D. Cal. 1988) (equity cushion of 10-

13% was adequate protection); *In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding

that a 10% equity cushion was sufficient to be adequate protection); *In re Mallas Enterprises,*

*Inc.*, 37 B.R. 964 (B.A.P. 9th Cir. 1984) (equity cushion that was at least 21% of the value of the

property and possibly more was sufficient adequate protection); *In re Palmer River Realty, Inc.*,

26 B.R. 138, 141-142 (Bankr. D.R.I. 1983) (8% equity cushion is adequate protection); *In re*

*Mellor*, 734 F.2d 1369, 1401 (9th Cir. 1984) (20% equity cushion sufficient); *In re Rogers*

*Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (holding that an equity cushion of

approximately 15-20% was sufficient adequate protection to the creditor, even though "the

amount of the equity cushion may decrease daily as a result of the accruing interest and other

cost" and the debtors had no equity in the property); *In re Public Service Co. of New Hampshire*,

88 B.R. 558, 561-562; (7% equity cushion adequate); *In re Johnston*, 38 B.R. 34, 36 (Bankr. D.

Vt. 1983) (11% equity cushion sufficient); *In re Helionetics, Inc.* 70 B.R. 433, 440 (Bankr. C.D.

Cal. 1987) (20.4% equity cushion was sufficient).

43.     Notwithstanding the foregoing, Regal claims that it is undersecured.  If that is the

case (a proposition we dispute), Regal is entitled to no post-petition interest and would be

entitled to no adequate protection payments absent proof that the Property is diminishing in

value.  *See In re Weinstein*, 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998) ("Where there is no

depreciation, there is no entitlement to adequate protection payments."); *In re Orlando Trout*

*Creek Ranch*, 80 B.R. 190, 191 (Bankr. N.D. Cal. 1987) (holding that an undersecured creditor's

claim is "adequately protected where its security is not depreciating.").

44.     While Regal has filed many pleadings in this case and has made many assertions

of fact (some of which have been contradictory) the Bank has never claimed that the Property is

diminishing in value. If Regal is undersecured as it claims (which WPP disputes) and there is no

dimunition in value, Regal is not entitled to adequate protection or interest payments.

## CONCLUSION

WPP respectfully requests that the Court deny Regal's motion for relief from the

automatic stay.

Respectfully Submitted,

BUSH STROUT & KORNFELD

By_____/s/ Christine M. Tobin_____
    Christine M. Tobin, WSBA No. 27628
    Attorneys for Debtor

BUTLER RUBIN SALTARELLI & BOYD LLP

By_____/s/ Neal L. Wolf_____
    Neal L. Wolf, Illinois ARDC No. 6186361
    Cheryl Tama Oblander, Illinois ARDC No.
    6199464
    Kevin J. O'Brien, Illinois ARDC No. 6193882
    Karen M. Borg, Illinois ARDC No. 6228879
    Attorneys for Debtor

454888v1